**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
              :

**EVERCRETE CORPORATION and**
**RAYMOND WILLIS,**
               :

           **Plaintiffs,**    :

               :

    **- against -**         :

               :

**H-CAP LIMITED, EVERCRETE**
**CORPORATION, RHODA HARDY**
**LEONORAH GLATTHAAR, and**
**HARVEY BOULTER,**
               :

           **Defendants.**  :
-------------------------------------------------------X

**OPINION AND ORDER**

**05 Civ. 9249 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/27/06

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I. INTRODUCTION

This case turns on a dispute over ownership of Evercrete Corporation,

a New York corporation ("Evercrete New York"), and the trademark

EVERCRETE. Raymond Willis and Evercrete New York bring this action

alleging trademark infringement, conversion, unjust enrichment, common law

fraud, and mail and wire fraud in violation of the Racketeering Influenced and

Corrupt Organizations Act ("RICO").[1] H-Cap Limited ("H-Cap"), Evercrete

Corporation, a Delaware corporation ("Evercrete Delaware"), and Rhoda Hardy

---

[1]    18 U.S.C. §§ 1962(c)-(d).

1

now move to dismiss and to realign Evercrete New York as a defendant.[2]  For the following reasons, defendants' motion is granted in part and denied in part.

## II.    BACKGROUND[3]

### A.    The 1918 Formula and EVERCRETE Mark

In 1918, a formula for concrete sealant was invented ("1918 Formula"), and at some point thereafter, Benjamin Hardy obtained the rights to that formula.[4]  In 1941, Benjamin Hardy incorporated Evercrete New York to sell concrete sealant made using the 1918 Formula.[5]  In 1942, Evercrete New York obtained United States Trademark Registration No. 397,748 for the mark EVERCRETE from the United States Patent and Trademark Office ("USPTO").[6] From 1941 "onward," Evercrete New York actively used the EVERCRETE mark for concrete sealant made pursuant to the 1918 Formula.[7]

---

[2]      For purposes of this Opinion and Order, I refer to H-Cap, Evercrete Delaware, and Hardy as "defendants."  Leonorah Glatthaar and Harvey Boulter have not appeared in this action.

[3]      Except where otherwise noted, the following allegations are drawn from the Complaint and presumed to be true for purposes of this motion.

[4]      *See* Second Amended Complaint ("Compl.") ¶ 12.

[5]      *See id.* ¶ 13.

[6]      *See id.* ¶ 14.

[7]      *Id.* ¶ 15.

In the early 1940s, Benjamin Hardy authorized his brother, Richard Hardy, to use the 1918 Formula to produce sealant on the West Coast and to sell that sealant under the EVERCRETE mark, as well as the brand name CRETO.[8] In or about 1974, Richard Hardy conveyed his company, the 1918 Formula, the CRETO mark, its associated goodwill, and his license to use the EVERCRETE mark to William Myers.[9] Evercrete New York authorized Myers and his company, Creto International ("Creto") to sell concrete sealant under the mark EVERCRETE.[10] "[F]or many years thereafter," Myers and Creto sold sealant made pursuant to the 1918 Formula under the marks EVERCRETE and CRETO.[11]

In 1982, Evercrete New York renewed the EVERCRETE mark for a twenty-year term.[12] Rhoda Hardy obtained an equity interest in Evercrete New York in 1985 after the death of her husband, Alan Hardy.[13]

## B. Evercrete New York's Bankruptcy Proceedings

---

[8]   *See id.* ¶ 27.

[9]   *See id.* ¶ 28.

[10]   *See id.* ¶ 29.

[11]   *Id.* ¶ 28.

[12]   *See id.* ¶ 16.

[13]   *See id.* ¶ 17. Alan Hardy was Benjamin Hardy's son. *See id.*

3

On February 25, 1986, Evercrete New York filed for bankruptcy protection in the Bankruptcy Court for the Southern District of New York.[14] In that proceeding, Evercrete New York filed an Amended Disclosure Statement ("Disclosure Statement") providing that its "intangibles and tradename" assets had an estimated book value of "0" and an estimated liquidation value of "0".[15] The Disclosure Statement also provided that the "general intangibles owned by [Evercrete New York] consist[] of the name 'Re-Nu-It' under which the [Evercrete New York]'s product has been marketed," and that due to product failures and a lack of sales, "the value of the tradename is considered by [Evercrete New York] to be for all intents and purposes without value."[16]

At the time of the reorganization, Evercrete New York's sole equity interest holder was Rhoda Hardy, and Evercrete New York's largest creditor was Steven Offerman.[17] Evercrete New York's Plan of Reorganization dated December 29, 1986 ("Plan") provided that "equity interest holders in the Debtor

---

[14] *See id.* ¶ 18.

[15] Amended Disclosure Statement ("Disclosure Statement") at 9, Ex. A to Declaration of Jeremy Siegel, Paralegal for Greenberg Traurig, Counsel to Defendants ("Siegel Decl.").

[16] *Id.* at 12.

[17] *See* Compl. ¶¶ 17, 20.

4

shall retain their interests."[18]  The Plan also provided that "[i]n order to obtain the

requisite funds required to consummate the Plan, a corporation to be formed by

Rhoda Hardy and Stephen Offerman will purchase all the Debtor's assets and pay

therefore an amount equal to that necessary for consummation of the Plan."[19]

In accordance with the Plan, Hardy and Offerman formed Re-Nu-It

Coatings, Inc. ("Re-Nu-It Coatings").[20]  Plaintiffs allege that during the

reorganization proceeding, all of Evercrete New York's assets, including the 1918

Formula and the mark EVERCRETE, were transferred to Re-Nu-It Coatings.[21]  On

July 22, 1987, the Bankruptcy Court entered an order confirming the Plan

("Confirmation Order").[22]  The Confirmation Order provided that the Plan would

bind Evercrete New York, its creditors, and any entity acquiring property under

the Plan.[23]  After the confirmation, in or about 1988, Hardy conveyed all of her

---

[18]  Plan § 3.6, Ex. C to Compl.

[19]  *Id.* § 4.2.

[20]  *See* Compl. ¶ 20.

[21]  *See id.* ¶¶ 19, 21.

[22]  *See id.* ¶ 18.

[23]  *See* Confirmation Order ¶¶ 3-4, Ex. B to Declaration of Rhoda Hardy in Support of Defendants' Motion to Dismiss ("Hardy Decl.").

equity interest in both Re-Nu-It Coatings and Evercrete New York to Offerman.[24] By 1988, Evercrete New York had ceased doing business.[25] On October 8, 1992, Evercrete New York filed an application with the Bankruptcy Court to close the case, signed by Hardy as "Secretary" of Evercrete New York.[26] On October 26, 1992, the Bankruptcy Court entered a decree declaring the Plan "fully consummated as appears by the annexed application" ("Final Decree").[27]

## C.     Evercrete Asia

In or about 2000, Myers and Creto provided initial funding for Evercrete International (Asia) Ltd. ("Evercrete Asia"), a business venture formed by Leonorah Glatthaar to distribute Evercrete-branded concrete sealant in Asia.[28] In 2002, Harvey Boulter became a shareholder in Evercrete Asia.[29] At that time, Boulter and Glatthaar, who are husband and wife, began to sell "counterfeit"

---

[24]     *See* Compl. ¶¶ 22-23.

[25]     *See id.* ¶ 44.

[26]     Application of Evercrete New York to Bankruptcy Judge Burton R. Lifland ¶¶ 3, 6, Ex. D to Hardy Decl.

[27]     Final Decree, Ex. E to Hardy Decl.

[28]     *See* Compl. ¶¶ 32, 34.

[29]     *See id.* ¶ 36.

6

sealant alongside Myers' Evercrete sealant.[30]  Boulter and Glatthaar formed H-Cap

and Evercrete Delaware (collectively "H-Cap defendants") to legitimize their

fraudulent scheme to deceive the trade into believing that their product was

"genuine EVERCRETE concrete sealant" made according to the 1918 Formula.[31]

The H-Cap defendants falsely stated that their sealant was produced in the United

States, when in fact, it was produced in China.[32]

### D. Hardy Conveys the EVERCRETE Mark to H-Cap

In or about April 2002, the H-Cap defendants initiated contact with

Hardy via telephone and offered to buy the EVERCRETE mark and federal

registration from Evercrete New York.[33]  On August 21, 2002, Hardy executed an

agreement on behalf of Evercrete New York assigning the EVERCRETE mark and

associated goodwill to H-Cap for $4,000, which sum was "paid to Hardy

personally."[34]  In September 2002, H-Cap obtained a renewal of the registration of

---

[30]    *Id.* ¶ 177.

[31]    *Id.* ¶¶ 39, 172, 185.

[32]    *See id.* ¶ 172.

[33]    *See id.* ¶ 40.

[34]    *Id.* ¶ 41.

the mark EVERCRETE and a declaration of continued use from the USPTO.[35]

### E.    Offerman Conveys the EVERCRETE Mark to Willis

Re-Nu-It Coatings dissolved in 2001 and Offerman became the sole owner of the 1918 Formula and the mark EVERCRETE.[36]  In August 2005, Offerman conveyed all of his equity interest in Evercrete New York, the 1918 Formula, the EVERCRETE mark, and the goodwill associated with that mark to Willis.[37]  Willis has begun using the 1918 Formula and EVERCRETE mark "through a related company."[38]

### F.    The Nevada Action

Plaintiffs allege that in or about October 2003, the H-Cap defendants "forced Myers to assign to defendant H-Cap such rights to the mark EVERCRETE which Myers and or his company Creto owned" through fraud, duress, threat, and intimidation.[39]  In February 2004, Myers, Creto, and two other plaintiffs commenced suit in the United States District Court for the District of Nevada,

---

[35]    *See id.* ¶ 50.

[36]    *See id.* ¶ 24.

[37]    *See id.* ¶ 25.

[38]    *Id.* ¶ 26.

[39]    *Id.* ¶¶ 60-61.

alleging that H-Cap, Evercrete Delaware, and Leonorah Boulter (formerly Leonorah Glatthaar) had false represented that the concrete sealant they were selling under the mark EVERCRETE was based on the 1918 Formula (the "Nevada Action").[40] Willis was not a party to the Nevada Action. In September 2004, the parties to the Nevada Action reached a settlement, under which the plaintiffs assigned any rights "any of them, possess . . . in and to the mark[] EVERCRETE . . . together with all rights and goodwill related thereto" to H-Cap.[41] In turn, the defendants in the Nevada Action agreed to "refrain from stating or implying" that their products "have any relationship whatsoever to a 1918 formula."[42]

On August 8, 2005, Willis submitted an affidavit in the Nevada Action as a "special projects officer" stating that he had "performed an investigation and discovered fraud perpetrated by [H-Cap]" in that action.[43] Willis requested that the Nevada court order his "testimony and presentation of

---

[40]     *See id.* ¶¶ 65-66.

[41]     Settlement Contract ¶ 16, Ex. G to Compl.

[42]     *Id.* ¶ 39.

[43]     Affidavit in Support of Order to Show Cause re Ordering Testimony and Presentation of Evidence by Raymond Willis, ¶ 2, Ex. B to Siegel Decl.

evidence."[44] On August 17, 2005, the Nevada court entered a Permanent Injunction Order enforcing the settlement, without reference to Willis' affidavit ("Nevada Settlement Order").[45]

## F. H-Cap's Use of the EVERCRETE Mark

Since the conclusion of the Nevada Action, the H-Cap defendants have continued to market their products under the EVERCRETE mark, to obtain additional registrations of that mark for various goods, and to represent to the trade that their sealant is made with the 1918 Formula.[46] Plaintiffs allege that the H-Cap defendants' "counterfeit product failed in projects where it was applied," and consequently damaged the goodwill associated with EVERCRETE mark.[47] Plaintiffs allege that the H-Cap defendants have used the mail and wires to obtain trademark registrations and to sell their products under the false pretense that H-Cap has rights to the Evercrete brand.[48]

Defendants now move to dismiss the action, arguing that Willis has

---

[44]    *Id.* ¶ 1.

[45]    *See* Nevada Settlement Order, Ex. C to Siegel Aff.

[46]    *See* Compl. ¶¶ 73-78.

[47]    *Id.* ¶¶ 180-181.

[48]    *See id.* ¶¶ 38, 73, 169-170, 181, 187.

no rights to Evercrete New York or the EVERCRETE mark. Defendants argue that prior Bankruptcy Court proceedings *first*, preclude plaintiffs' argument that either Evercrete New York or the EVERCRETE mark were ever transferred to Offerman,[49] and *second*, establish that plaintiffs' claim to the EVERCRETE mark rests on an alleged assignment that would have been invalid under the Lanham Act.[50]

Defendants also move to dismiss plaintiffs' common law fraud and RICO claims, arguing that plaintiffs have failed to plead their fraud allegations with particularity. Defendants further argue that plaintiffs' fraud allegations with respect to the Nevada action are precluded by the Nevada Settlement Order. Finally, defendants move to dismiss plaintiffs' RICO claims on the grounds that plaintiffs have failed to plead an enterprise or a pattern of racketeering.

## III.  LEGAL STANDARD

### A.  Motion to Dismiss

A motion to dismiss pursuant to Rule 12(b)(6) should be granted only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support

---

[49]     Plaintiffs allege that Willis is Offerman's successor in interest with respect to rights to Evercrete New York and the EVERCRETE mark. *See id.* ¶ 25.

[50]     15 U.S.C. §§ 1051 *et seq.*

of [its] claim which would entitle [it] to relief.'"[51] When deciding a motion to dismiss, courts must accept all factual allegations in the complaint as true, and draw all reasonable inferences in plaintiff's favor.[52] Although the plaintiff's allegations are taken as true, the claim may still fail as a matter of law if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief, or if the claim is not legally feasible.[53] A party may raise a defense of res judicata, collateral estoppel, or judicial estoppel on a motion to dismiss pursuant to Rule 12(b)(6) where the basis for that defense is set forth on the face of the complaint or established by public record.[54]

## B. Preclusion and Estoppel

### 1. Res Judicata

---

[51] *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

[52] *See Ontario Pub. Serv. Employees Union Pension Trust Fund v. Nortel Networks Corp.*, 369 F.3d 27, 31 (2d Cir. 2004) (citation omitted).

[53] *See, e.g., Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, L.L.P.*, 322 F.3d 147, 158 (2d Cir. 2003).

[54] *See Cameron v. Church*, 253 F. Supp. 2d 611, 619 (S.D.N.Y. 2003) (deciding res judicata and collateral estoppel issues on motion to dismiss). *See also Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998) ("It is well established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6), including case law and statutes.").

Res judicata, or claim preclusion, is the long-accepted principle that "'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'"[55] Res judicata ordinarily applies "if the earlier decision was (1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same cause of action."[56]

## 2. Collateral Estoppel

Collateral estoppel, or issue preclusion, precludes re-litigation of an issue where "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits."[57] "The burden of showing that an issue raised in a subsequent proceeding is identical to one that was raised and necessarily decided in the prior action rests squarely on

---

[55]     *San Remo Hotel, L.P. v. San Francisco*, — U.S. —, 125 S.Ct. 2491, 2500 n.16 (2005) (quoting *Allen v. McCurry*, 449 U.S. 90, 948 (1980)).

[56]     *Stephenson v. Dow Chem. Co.*, 273 F.3d 249, 259 (2d Cir. 2001), *aff'd in part, vacated in part on other grounds*, 539 U.S. 111 (2003).

[57]     *Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 147 (2d Cir. 2005) (quotation marks and citation omitted).

13

the party moving for preclusion."[58]

### 3. Judicial Estoppel

"The equitable doctrine of judicial estoppel provides that, '[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.'"[59] A litigant who asserts judicial estoppel must establish that "(1) the party against whom judicial estoppel is being asserted advanced an inconsistent factual position in a prior proceeding, and (2) the prior inconsistent position was adopted by the first court in some manner."[60] Moreover, the doctrine is limited "to situations where the risk of inconsistent results with its impact on judicial integrity is certain."[61]

### C. Assignment of a Trademark Under the Lanham Act

Under the Lanham Act, a mark "shall be assignable with the goodwill

---

[58]     *Cobb v. Pozzi*, 363 F.3d 89, 114 (2d Cir. 2004) (citation and quotation marks omitted).

[59]     *Uzdavines*, 418 F.3d at 147 (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)).

[60]     *United States v. Hussein*, 178 F.3d 125, 130 (2d Cir. 1999) (quotation marks and citation omitted).

[61]     *Uzdavines*, 418 F.3d at 147 (quotation marks and citation omitted).

14

of the business in which the mark is used, or with that part of the good will of the business connected with the use of and symbolized by the mark."[62] It is a "well-established principle that a mark is not property that may be assigned 'in gross' . . . 'Trademark rights do not exist in the abstract, to be bought and sold as a distinct asset.'"[63] "A trademark can lose its protectable status when it is assigned to another without a corresponding transfer of assets or good will because use of the mark on a different product or service may act to defraud the purchasing public."[64]

The Lanham Act also provides that "[a]n assignment shall be void against any subsequent purchaser for valuable consideration without notice, unless the prescribed information reporting the assignment is recorded in the United States Patent and Trademark Office within 3 months after the date of the

---

[62]    15 U.S.C. § 1060.

[63]    *Berni v. International Gourmet Rest. of Am., Inc.*, 838 F.2d 642, 646 (2d Cir. 1988) (quoting *Universal City Studios, Inc. v. Nintendo Co.*, 578 F. Supp. 911, 922 (S.D.N.Y. 1983), *aff'd on other grounds*, 746 F.2d 112 (2d Cir. 1984)). *Accord Marshak v. Green*, 746 F.2d 927, 929 (2d Cir. 1984).

[64]    *Becoming, Inc. v. Avon Prods., Inc.*, No. 01 Civ. 5863, 2001 WL 930794, at *5 (S.D.N.Y. Aug. 15, 2001) (citing *Defiance Button Mach. Co. v. C & C Metal Prods. Corp.*, 759 F.2d 1053, 1059-62 (2d Cir. 1985) and *Clark & Freeman Corp. v. Heartland Co.*, 811 F. Supp. 137, 139 (S.D.N.Y. 1993)).

assignment or prior to the subsequent purchase."[65]

## D.    Fraud

To prove fraud under New York law, "'a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance.'"[66] "In cases in which the alleged fraudulent misrepresentation by the defendant was made to a third party rather than to the plaintiff directly, the plaintiff must allege 'that he relied to his detriment on the defendant's misrepresentation and that the defendant intended the misrepresentation to be conveyed to him.'"[67]

Under Rule 9(b) of the Federal Rules of Civil Procedure, allegations of fraud must be pleaded with particularity. "[W]hen a complaint charges fraud, it must (1) detail the statements (or omissions) that the plaintiff contends are

---

[65]    15 U.S.C. § 1060(a)(4).

[66]    *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 186-87 (2d Cir. 2004) (quoting *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995)).

[67]    *Pennecom B.V. v. Merrill Lynch & Co., Inc.*, No. 02 Civ. 5355, 2005 WL 2044948, at *7 (S.D.N.Y. Aug. 25, 2005) (quoting *Securities Investor Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 71 (2d Cir. 2000)).

fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent."[68]

## E.   RICO

A plaintiff claiming a civil RICO violation must allege each of the claim's elements, including "(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity."[69]  In considering civil RICO claims, a court must be mindful of the devastating effect such claims may have on defendants.[70]  Civil RICO should not be used to transform a "garden variety fraud or breach of contract case[] . . . into a vehicle for treble damages."[71]

---

[68]     *Harsco Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir. 1996).

[69]     *Anatian v. Coutts Bank (Switzerland) Ltd.*, 193 F.3d 85, 88 (2d Cir. 1999) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

[70]     *See Kirk v. Heppt*, No. 05 Civ. 9977, 2006 WL 689510, at *2 (S.D.N.Y. Mar. 20, 2006) ("Because the mere assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as defendants, . . . courts should strive to flush out frivolous RICO allegations at an early stage of the litigation.") (citations and quotation marks omitted).

[71]     *Goldfine v. Sichenzia*, 118 F. Supp. 2d 392, 394 (S.D.N.Y. 2000). *Accord Kirk*, 2006 WL 689510, at *2 (courts "must be wary of putative civil RICO claims that are nothing more than sheep masquerading in wolves' clothing"); *Schmidt v. Fleet Bank*, 16 F. Supp. 2d 340, 346 (S.D.N.Y. 1998) (because civil RICO "is an unusually potent weapon -- the litigation equivalent of a thermonuclear device . . . courts must always be on the lookout for the putative RICO case that is really nothing more than an ordinary fraud case clothed in the

## 1.  Enterprise

A RICO "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."[72] The RICO enterprise must be "'an entity separate and apart from the pattern of activity in which it engages.'"[73] "In other words, the 'enterprise' must not be just a name for the crimes [its] members committed."[74] "In perhaps its least developed form, an enterprise may be found where there is simply a discrete economic association existing separately from the racketeering activity."[75]

A party must plead the existence of a RICO enterprise in accordance with Rule 8 of the Federal Rules of Civil Procedure.[76] Rule 8 requires "a short and

Emperor's trendy garb").

[72]    18 U.S.C. § 1961(4).

[73]    *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).

[74]    *United States v. Smith*, 413 F.3d 1253, 1267 (10th Cir. 2005).

[75]    *First Capital Asset Mgmt., Inc.*, 385 F.3d at 173 (citations and quotation marks omitted).

[76]    *See Sony Music Entmt. Inc. v. Robison*, No. 01 Civ. 6415, 2002 WL 272406, at *6 (S.D.N.Y. Feb. 26, 2002) (citing *Trustees of the Plumbers and Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc.*, 886 F. Supp. 1134, 1145 (S.D.N.Y. 1995)).

plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a) does not require "a plaintiff to plead the legal theory, facts, or elements underlying his claim."[77] "To comply with Rule 8, plaintiffs need not provide anything more than sufficient notice to permit defendant to file an answer."[78]

### 2. Pattern of Rackeeterring Activity

#### a. Mail Fraud and Wire Fraud

To plead a "pattern" of racketeering activity, a plaintiff must allege at least two predicate acts of racketeering activity occurring within a ten-year period.[79] "RICO defines racketeering activity to include mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343."[80] The elements of mail and wire fraud are "(i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate mail or wires."[81] As to the first

---

[77]   *Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir. 2005) (citations omitted).

[78]   *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 323 (S.D.N.Y. 2003) (citations omitted).

[79]   18 U.S.C. § 1961(5).

[80]   *Ideal Steel Supply Corp. v. Anza*, 373 F.3d 251, 256 (2d Cir. 2004) (citations omitted).

[81]   *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (citations omitted).

element, a plaintiff must demonstrate "(i) the existence of a scheme to defraud, (ii) the requisite scienter (or fraudulent intent) on the part of the defendant, and (iii) the materiality of the misrepresentations."[82]

Because "[t]he mail and wire fraud statutes are broader than a claim of common law fraud," it is possible for a plaintiff to sufficiently plead mail or wire fraud while nevertheless failing to plead common law fraud.[83] To demonstrate mail or wire fraud, "the actual transmissions that use the mails and wires do not have to be false or contain misrepresentations — only the scheme must be fraudulent."[84] Along these lines, the Second Circuit has held that the civil-RICO plaintiff need not be the entity that relied on the fraudulent communication:

> [W]here a complaint contains allegations of facts to show
> that the defendant engaged in a pattern of fraudulent
> conduct that is within the RICO definition of racketeering
> activity and that was intended to and did give the defendant
> a competitive advantage over the plaintiff, the complaint
> adequately pleads proximate cause, and the plaintiff has
> standing to pursue a civil RICO claim. This is so even
> where the scheme depended on fraudulent communications

---

[82]    *Id.* (citations omitted).

[83]    *Moses v. Martin*, 360 F. Supp. 2d 533, 547-48 (S.D.N.Y. 2004).

[84]    *City of New York v. Cyco.Net, Inc.*, 383 F. Supp. 2d 526, 552 (S.D.N.Y. 2005) (citation omitted).

directed to and relied on by a third party rather than the plaintiff.[85]

Mail and wire fraud must be plead with particularity in accordance with Rule 9(b).[86]  Where a plaintiff claims that specific mail or wire transmissions "were themselves fraudulent, i.e., themselves contained false or misleading information, the complaint should specify the fraud involved, identify the parties responsible for the fraud, and where and when the fraud occurred."[87]  But where the plaintiff claims that the mail or wires were simply used in furtherance of a scheme to defraud, the complaint "need not be specific as to each allegation of mail or wire fraud" as long as "the nature of the RICO scheme is sufficiently pleaded so as to give notice to the defendants."[88]

---

[85]     *Ideal Steel Supply Corp.*, 373 F.3d at 263 (entrepreneur had standing under RICO for injury to its business caused by competitor's alleged practice of unlawfully selling products free of sales tax and submitting fraudulent sales tax returns to the New York State Department of Taxation and Finance in violation of mail and wire fraud statutes).

[86]     *See First Capital Asset Mgmt., Inc.*, 385 F.3d at 178 ("all allegations of fraudulent predicate acts[] are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)").

[87]     *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998) (citing *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

[88]     *First Interregional Advisors Corp. v. Wolff*, 956 F. Supp. 480, 485 (S.D.N.Y. 1997) (citation omitted). *Accord In re Sumitomo Copper Litig.*, 995 F. Supp. at 456.

## b. Continuity

The predicate acts alleged by the plaintiff must be related and continuous.[89] "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition."[90]  To determine closed-ended continuity, a court must "'weigh[] a variety of non-dispositive factors, including, inter alia, the length of time over which the alleged predicate acts took place, the number and variety of acts, the number of participants, the number of victims, and the presence of separate schemes.'"[91]  To demonstrate open-ended continuity, the predicate acts must "amount to or pose a threat of continued criminal activity."[92] "In assessing whether or not the plaintiff has shown open-ended continuity, the

---

[89]     *See H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239-40 (1989); *Schlaifer Nance & Co. v. Estate of Andy Warhol*, 119 F.3d 91, 97 (2d Cir. 1997).

[90]     *H.J. Inc.*, 492 U.S. at 241 (citation omitted).

[91]     *Zito v. Leasecomm Corp.*, No. 02 Civ. 8074, 2003 WL 22251352, at *16 (S.D.N.Y. Sept. 30, 2003) (quoting *GICC Capital Corp. v. Technology Fin. Group, Inc.*, 67 F.3d 463, 467 (2d Cir. 1995)).

[92]     *First Capital Asset Mgmt., Inc.*, 385 F.3d at 180 (citing *H.J. Inc.*, 492 U.S. at 239).

22

nature of the RICO enterprise and of the predicate acts are relevant."[93] "'Courts

have uniformly and consistently held that schemes involving a single, narrow

purpose and one or few participants directed towards a single victim do not satisfy

the RICO requirement of a closed or open pattern of continuity.'"[94]

## IV.  DISCUSSION

### A.  Preclusion, Estoppel, and the Lanham Act

#### 1.  Offerman's Alleged Acquisition of Evercrete New York

Willis' claim to ownership of Evercrete New York relies on an

alleged transfer of that corporation from Hardy to Offerman.  Defendants argue

that the Final Decree of the Bankruptcy Court precludes plaintiffs' claim that

---

[93]    *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242
(2d Cir. 1999).  Where the racketeering acts are "inherently unlawful" and
"performed at the behest of an enterprise whose business is racketeering," open-
ended continuity is presumed.  *GICC Capital Corp.*, 67 F.3d at 466 (citation
omitted).  However, "where the enterprise primarily conducts a legitimate
business, there must be some evidence from which it may be inferred that the
predicate acts were the regular way of operating that business, or that the nature of
the predicate acts themselves implies a threat of continued criminal activity."
*Cofacredit, S.A.*, 187 F.3d at 242 (citations omitted).

[94]    *Medinol Ltd. v. Boston Scientific Corp.*, 346 F. Supp. 2d 575, 616
(S.D.N.Y. 2004) (quoting *Lefkowitz v. Bank of N.Y.*, No. 01 Civ. 6252, 2003 WL
22480049, at *8 (S.D.N.Y. Oct. 31, 2003)).

Offerman acquired Evercrete New York from Hardy.[95] Defendants also argue that

because the bankruptcy documents establish Hardy's ownership of Evercrete New

York, Evercrete New York should be realigned as a defendant in this action.[96]

Defendants interpret the Final Decree to require that "Rhoda Hardy

shall remain unaffected as sole shareholder of Evercrete New York."[97] But the

1992 Final Decree only declared that a Plan that did not disturb the interests of

existing equity holders at the time of confirmation had been consummated.[98]

Plaintiffs allege that Hardy conveyed her equity interests in Evercrete New York

to Offerman in 1988, *after* the Bankruptcy Court confirmed the Plan in 1987.[99]

The Plan did not constrain any party's rights to convey its interests, or preserve

any party's rights in perpetuity.

---

[95]     *See* Memorandum of Law in Support of Motion to Dismiss Amended
Complaint and to Realign Plaintiff Evercrete Corporation as a Defendant ("Def.
Mem.") at 6 (arguing res judicata and collateral estoppel theories); Supplemental
Memorandum of Law in Support of Motion to Dismiss Second Amended
Complaint and to Realign Plaintiff Evercrete Corporation as a Defendant ("Def.
Supp. Mem.") at 7 (arguing judicial estoppel theory based on Offerman's
acceptance of the Plan and Disclosure Statement).

[96]     *See* Def. Mem. at 15-16.

[97]     *Id.* at 6.

[98]     *See* Plan § 3.6 ("equity interest holders in the Debtor shall retain their
interests" as of effective date).

[99]     *See* Compl. ¶ 23.

24

The parties dispute whether, at the time she signed the application to close the bankruptcy case in 1992 as "Secretary" of Evercrete New York, Hardy had conveyed her interests in Evercrete New York to Offerman.[100] Offerman may have failed to contest Hardy's authority to apply for the Final Decree as an *officer* of Evercrete New York. But this does not, as a matter of law, establish that Hardy never transferred her *ownership* interest in Evercrete New York. This is a factual disputes which cannot be resolved at this stage of the pleadings. Therefore, defendants' motion to dismiss on this ground is denied, as is defendants' motion to realign Evercrete New York as a defendant.

### 2.    Offerman's Alleged Acquisition of the EVERCRETE Mark

Plaintiffs allege that pursuant to the Plan, the EVERCRETE mark was sold to Re-Nu-It Coatings along with all of Evercrete New York's other assets, including the 1918 Formula.[101] Plaintiffs allege that thereafter, Hardy conveyed her interest in Re-Nu-It Coatings to Offerman, Offerman became the sole-owner of Re-Nu-It Coatings' assets, including the EVERCRETE mark, and Offerman

---

[100]    Reply Memorandum in Support of Defendants' Motion to Dismiss the Second Amended Complaint and to Realign Plaintiff Evercrete Corporation as a Defendant ("Reply Mem.") at 3.

[101]    *See* Compl. ¶¶ 19-21.

conveyed those assets to Willis.[102]

Defendants argue that the bankruptcy documents preclude plaintiffs' claim that Offerman became the owner of the EVERCRETE mark.[103] But no provision of the Plan, Confirmation Order, or Final Decree specifically refers to the EVERCRETE mark. The Plan refers to Evercrete New York's asset sale as a future event without setting forth the terms of that transaction.[104] Based on these documents alone, I cannot conclude, as a matter of law, that the EVERCRETE mark was not sold to Re-Nu-It Coatings during Evercrete New York's reorganization. Moreover, even if the EVERCRETE mark remained property of Evercrete New York through the reorganization, plaintiffs may still have a claim to that mark based on the allegation that Hardy conveyed Evercrete New York to Offerman after the Plan's confirmation in 1987.[105]

[102]   *See id.* ¶¶ 22, 24, 25.

[103]   *See* Def. Mem. at 10.

[104]   *See* Plan § 4.2 ("a corporation *to be formed* by Rhoda Hardy and Stephen Offerman *will purchase* all the Debtor's assets") (emphasis added). It is not clear from the pleadings or submissions whether Evercrete New York and Re-Nu-It Coatings, Inc. entered into an asset purchase agreement or other document executing the asset sale.

[105]   *See* Compl. ¶ 25. "[A] trademark may be retained by its owner even though the existing business' assets are sold" where the owner "evidences an intention not to abandon the mark." *Berni*, 838 F.2d at 646 (citing *Defiance Button Mach. Co.*, 759 F.2d at 1061).

Defendants argue that any alleged assignment of the EVERCRETE mark by Evercrete New York would have been void under the Lanham Act as an assignment of a trademark in gross, without associated goodwill.[106] Defendants argue that plaintiffs are estopped from asserting that the EVERCRETE mark was associated with any goodwill at the time of the reorganization, because the Disclosure Statement demonstrates that *first*, Evercrete New York abandoned the EVERCRETE mark in favor of the mark RE-NU-IT, and *second* neither mark had any value.[107]

To prevail on a collateral estoppel theory, Defendants must first demonstrate that the Bankruptcy Court "actually and necessarily decided" that the EVERCRETE mark was abandoned or without value.[108] Defendants have not carried that burden. Neither the Disclosure Statement, nor any other proffered reorganization document mentions the EVERCRETE mark by name. Moreover, the Disclosure Statement provides that "the Bankruptcy Court does not attest to

---

[106] *See* Def. Supp. Mem. at 6, 8-10 (citing 15 U.S.C. § 1060; *Universal City Studios, Inc.*, 578 F. Supp. at 922-23).

[107] *See* Reply Mem. at 8-9.

[108] *Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 94 (2d Cir. 2005). *Accord Cobb*, 363 F.3d at 114 (party asserting collateral estoppel must demonstrate that prior court decided the "identical" issue).

the accuracy of the information contained herein."[109]  Neither the Confirmation

Order nor the Final Decree expressly ratifies the financial information in the

Disclosure Statement.

To prevail on a theory of judicial estoppel, defendants must

demonstrate that *first*, Offerman, as Willis' predecessor, advanced the position that

the EVERCRETE mark had no goodwill and *second*, that the Bankruptcy Court

adopted that position in some form.[110]  Defendants argue that Offerman accepted

the Plan in writing and did not object to the Disclosure Statement's provision that

Evercrete New York had no tradename assets of value.[111]  But this does not

demonstrate that Offerman *advanced* the position that the EVERCRETE mark had

no value.  The cases cited by defendants in which creditors were estopped from

contesting bankruptcy court determinations involve more than mere creditor

acquiescence and are therefore inapposite.[112]

---

[109]    Disclosure Statement at 3.  The purpose of the Disclosure Statement
was only to give creditors information necessary to vote on the Plan.  *See id.* at 2.

[110]    *See Hussein*, 178 F.3d at 130.

[111]    *See* Def. Supp. Mem. at 6.

[112]    *See, e.g., In re Network Access Solutions Corp.*, 330 B.R. 67, 78
(Bankr. D. Del. 2005) (creditors estopped from attempting to recover contractual
payments as fraudulent after creditors had expressly supported debtor's
assumption of those contracts); *Shapiro v. Vanda Rest. Corp. (In re Litas Int'l,
Inc.)*, No. 96 Civ. 3169, 1996 WL 671027, at *8 (S.D.N.Y. Nov. 20, 1996)

Even assuming, arguendo, that the Bankruptcy Court confirmed the

Plan based on Offerman's acceptance of the Disclosure Statement, that statement

does not establish that Evercrete New York had any *intent* to abandon the

EVERCRETE mark when it began doing business as Re-Nu-It.[113] Nor does the

Disclosure Statement determine conclusively that the EVERCRETE mark had lost

all good will — plaintiffs argue that the Disclosure Statement's valuation of

tradename assets at zero was only in reference to the mark RE-NU-IT.[114] This

factual dispute cannot be resolved at this point of the proceedings.

Defendants also argue that the Complaint is deficient because it does

not allege that Offerman recorded any assignment of the EVERCRETE mark with

---

(creditor was estopped from asserting ownership of debtors' asset where that creditor and the debtor were under common control, and the creditor had taken several actions inconsistent with ownership); *In re Gallerie des Monnaies of Geneva, Ltd.*, 62 B.R. 224, 226 (S.D.N.Y. 1986) (debtor estopped from seeking to void a preferential transfer because that would contradict debtor's own disclosure that no preferential transfers existed).

[113]    To prove a trademark abandoned, a defendant must demonstrate that use of that mark "has been discontinued with intent not to resume." 15 U.S.C. § 1127. Nonuse does not equate to abandonment in all circumstances – for example, ownership rights can be maintained through licensing. *See, e.g., Doeblers' Pa. Hybrids, Inc. v. Doebler*, — F.3d — , 2006 WL 722156, at *8 (3d Cir. Mar. 23, 2006) ("Even assuming that only [a licensee] used the [trademark] after 1972, that would not constitute an abandonment of [the trademark holder's] rights as a matter of law.").

[114]    *See* Pl. Mem. at 8.

the USPTO within three months, as required by the Lanham Act.[115]  The Lanham

Act provides that an unregistered assignment is void against a subsequent

purchaser (here, H-Cap) if that subsequent purchaser was "without notice" of the

prior assignment.[116]  The Complaint alleges that H-Cap "knew or had reason to

know that in 2002" Evercrete New York and Hardy did not have any rights in the

mark EVERCRETE, for several reasons.[117]  These allegations are sufficient to

plead that H-Cap had notice of a prior assignment.

### 3.    Nevada Settlement Order

Defendants argue that plaintiffs' allegations of fraud with regard to

the Nevada Settlement Order are an impermissible collateral attack on an order of

the District Court of the District of Nevada.[118]  Defendants proffer two documents

in support of their claim:  Willis' August 8, 2005 application requesting to be

heard on the matter of fraud related to the settlement, and the Nevada Settlement

---

[115]    *See* Def. Mem. at 8-9.

[116]    15 U.S.C. § 1060(a)(4).

[117]    Compl. ¶¶ 43-48.

[118]    Defendants cannot (and do not) argue that the Nevada Settlement
Order precludes this action, because the Nevada court did not issue any order
regarding plaintiffs' rights to the mark EVERCRETE — it only approved a
settlement in which Myers assigned any rights he had to the mark EVERCRETE to
H-Cap. *See* Reply Mem. at 7.

Order dated August 17, 2005 enforcing the settlement.[119] The Nevada Settlement Order states that the Nevada court considered the submissions of the parties to that action, but it does not state any disposition of Willis' application. These documents alone do not establish that the issues raised by Willis were "actually and necessarily decided" by the Nevada court.[120] Therefore, defendants have not established that plaintiffs are estopped from making these allegations.

## B.   Common Law Fraud

Plaintiffs' common law fraud theory is that H-Cap falsely represented that Evercrete New York had assigned the EVERCRETE mark to H-Cap to defraud the USPTO into issuing the registration of that mark to H-Cap.[121] Plaintiffs do not allege that they themselves ever relied on any misrepresentation.[122] Courts have held that a plaintiff may establish reliance

---

[119]    A court may consider public records in deciding a motion to dismiss on the grounds of res judicata, collateral estoppel, or judicial estoppel. *See Pani*, 152 F.3d at 74.

[120]    *Hoblock*, 422 F.3d at 94.

[121]    *See* Compl. ¶ 138.

[122]    *See Formulated Solutions, LLC v. CKD, Inc.*, No. 02 Civ. 6490, 2005 WL 2413506, at *6 (E.D.N.Y. Sept. 29, 2005) ("Plaintiffs' claim must fail because *plaintiffs themselves* did not reasonably rely upon any alleged misrepresentations made by the defendants.") (emphasis added). Because I hold that plaintiffs have failed to plead reliance, I do not reach defendants' arguments with regard to the other elements of fraud.

where a defendant made a misrepresentation to a third party, if that defendant intended that the misrepresentation would be relayed to the plaintiff.[123] But plaintiffs do not allege that defendants had any such intent. Plaintiffs' allegations might support a claim for infringement and cancelation of the allegedly fraudulent registration, but not common law fraud.[124] Therefore, plaintiffs' common law fraud claim is dismissed.

## C.    RICO

### 1.    Enterprise

Defendants argue that plaintiffs' RICO claims should be dismissed because plaintiffs have failed to plead an enterprise separate from the pattern of racketeering activity.[125] The alleged RICO enterprise is an association-in-fact of the H-Cap defendants (Glatthaar, Boulter, H-Cap, and Evercrete Delaware) and

---

[123]    *See, e.g., Pennecom B.V.*, 2005 WL 2044948, at *7; *Securities Investor Prot. Corp.*, 222 F.3d at 77 ("[S]everal decisions have suggested that a plaintiff may demonstrate reliance where the third party does not directly repeat the defendant's misrepresentations to the plaintiff, but rather communicates them in a repackaged or summary form, on which the plaintiff then relied.").

[124]    A district court may cancel a trademark registration based on a finding that the applicant made fraudulent representations to the USPTO. *See, e.g., Ushodaya Enter., Ltd. v. V.R.S. Int'l, Inc.*, 63 F. Supp. 2d 329, 335 (S.D.N.Y. 1999).

[125]    *See* Def. Supp. Mem. at 12 (citing *Turkette*, 452 U.S. at 583).

Evercrete Asia.[126]  The alleged enterprise has a structure — Glatthaar and Boulter are a married couple with authority and influence over H-Cap, Evercrete Delaware, and Evercrete Asia.[127]  Plaintiffs also allege that the enterprise is involved in activities beyond the predicate acts of mail and wire fraud, including "business relationships in the concrete sealant industry."[128]  Thus, plaintiffs' allegations are sufficient to plead an enterprise under Rule 8.

### 2. Pattern of Racketeering

#### a. Predicate Acts of Mail and Wire Fraud

Defendants argue that plaintiffs fail to plead the predicate acts of mail and wire fraud with particularity.  Plaintiffs allege that the racketeering enterprise used the mail and wires *first*, to contact Hardy and execute a fraudulent assignment of the EVERCRETE mark, *second,* to fraudulently procure a registration of that mark from the USPTO, and *third*, to market and sell their products under false pretenses.

#### 1. Fraudulent Assignment from Hardy

Plaintiffs allege that the H-Cap defendants made interstate telephone

---

[126]    *See* RICO Statement ¶ 6.

[127]    *See id.*

[128]    Compl. ¶¶ 169, 171, 177, 179, 185, 186.

calls to Hardy to acquire a fraudulent assignment of the EVERCRETE mark in or about April 2002.[129]  Defendants argue that plaintiffs do not allege facts to demonstrate that "H-Cap knew that Hardy did not have authority to convey her interest in the EVERCRETE mark."[130]

But plaintiffs plead a number of facts in support of scienter.  Plaintiffs allege that the H-Cap defendants knew that Evercrete New York sold all of its assets during its reorganization proceedings.[131]  Plaintiffs also allege that H-Cap had reason to be skeptical of Hardy's authority to act on behalf of Evercrete New York in 2002, based on the fact that H-Cap issued a check to Hardy personally in exchange for the EVERCRETE mark.[132]  Plaintiffs further allege that the H-Cap defendants had reason to know the assignment of the EVERCRETE mark was invalid because the 1918 Formula was not transferred along with the mark.[133]  Although defendants are correct that several of plaintiffs' scienter allegations are conclusory, plaintiffs allege sufficient facts to support an inference of scienter at

---

[129]  *See* Compl. ¶¶ 173, 187(b)(iv).

[130]  Reply Mem. at 11.

[131]  *See* Compl. ¶ 43.

[132]  *See id.* ¶ 45.

[133]  *See id.* ¶ 48.

34

the pleading stage.

## 2. Fraud on the USPTO

Plaintiffs cannot state a claim of mail or wire fraud by alleging that the H-Cap defendants fraudulently procured the registration of the EVERCRETE mark from the USPTO.[134] To state a claim for mail or wire fraud, a plaintiff must allege that the "object of the fraud . . . be '[money or] property' in the victim's hands."[135] The Supreme Court has held that a state's interest in licencing was "not 'property,' because the interest in choosing particular licensees was 'purely regulatory' and '[could not] be economic.'"[136] Following this principle, courts have held that because a registration is not money or property in the hands of the USPTO, a claim of vicarious injury based on a scheme to defraud the USPTO of a registration is not cognizable under the mail and wire fraud statutes.[137] Thus, I

---

[134]    *See id.* ¶ 171.

[135]    *Pasquantino v. United States*, 544 U.S. 349, 125 S.Ct. 1766, 1771 (2005) (citing *Cleveland v. United States*, 531 U.S. 12, 26 (2000)) (holding that the right to tax revenue was property in Canada's hands, for purposes of wire fraud statute).

[136]    *Id.* (quoting *Cleveland*, 531 U.S. at 26) ("It does not suffice, we clarify, that the object of the fraud may become property in the recipient's hands; for purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim.").

[137]    *See University of W. Va. v. Van Voorhies*, 278 F.3d 1288, 1303 (Fed. Cir. 2002); *Semiconductor Energy Lab. Co., Ltd. v. Samsung Elec. Co., Ltd.*, 204

cannot consider plaintiffs' allegations of fraud on the USPTO in determining whether plaintiffs have alleged at least two predicate acts of racketeering.

### 3. Fraudulent Sales and Marketing of Products

Plaintiffs also allege predicate acts of mail and wire fraud in connection with the marketing and sales of the H-Cap defendants' products. The alleged scheme has two aspects. *First*, customers purchased the H-Cap defendants' products in reliance on the H-Cap defendants' false claim to the Evercrete brand, diverting sales from plaintiffs.[138] *Second,* customers purchased the H-Cap defendants' products in reliance on the H-Cap defendants' false claims that their sealant was "genuine" Evercrete sealant made in the United States using the 1918 Formula.[139] The H-Cap defendants' products did not work, customers were injured, and the goodwill of the EVERCRETE mark was tarnished, injuring

---

F.3d 1368, 1379 (Fed. Cir. 2000); *Medina v. Bauer*, No. 02 Civ. 8837, 2004 WL 136636, at *5 (S.D.N.Y. Jan. 27, 2004). *But see Dow Chem. Co. v. Exxon Corp.*, 30 F. Supp. 2d 673, 696 (D. Del. 1998) (holding that the state's interest in an unissued patent is property within the meaning of the mail fraud statute, but dismissing claims on ground that injuries allegedly suffered by plaintiff were too remote to confer RICO standing).

[138] *See* Compl. ¶¶ 187(a)(iii)-(v); 188(b)(iii) (alleging that H-Cap makes false and misleading use of the EVERCRETE mark in their promotional and marketing materials through the mails to distributors nationwide).

[139] Compl. ¶ 172. *See also id* ¶ 187(b)(v) (alleging that H-Cap defendants use the wires to promote counterfeit sealant and transact purchase orders).

plaintiffs, the true owners of that mark.[140]

The first aspect of the alleged scheme boils down to a claim of willful trademark infringement – not racketeering.[141]  At its core, this a commercial dispute over rights to the EVERCRETE mark.[142]  All businesses use interstate mail or wires.  Congress did not intend that every trademark dispute would be brought under RICO.  Congress enumerated criminal trafficking in counterfeit marks in violation of section 2320 of Title 18 of Code as a predicate act.[143]  But no violation of that statute is alleged here.[144]  Plaintiffs may not reformulate garden variety

---

[140]    *See id.* ¶¶ 177-182.

[141]    *See Smith v. Jackson,* 84 F.3d 1213, 1218 (9th Cir. 1996) (affirming district court's dismissal of RICO claims where those claims were no more than "reformulated copyright infringement claims"); *Johnson Elec. N. Am., Inc. v. Mabuchi Motor Am. Corp.,* 98 F. Supp. 2d 480 (S.D.N.Y. 2000) (dismissing RICO count where claims were "nothing more than claims of knowing and deliberate patent infringement"); *Damiano v. Sony Music Entmt., Inc.,* 975 F. Supp. 623, 631 (D.N.J. 1996) (dismissing RICO claims that were "actually nothing more than copyright infringement claims presented as mail fraud").

[142]    *See Smith,* 84 F.3d at 1218 (affirming dismissal of RICO allegations where "without the alleged infringement of copyright, none of appellees' activity in disseminating their songs could be 'fraudulent' and none of appellants' RICO claims could survive").

[143]    *See* 18 U.S.C. § 1961(1).

[144]    A counterfeit mark under section 2320 must be "identical with, or substantially indistinguishable from, a mark registered on the principal register in the [USPTO] and in use." 18 U.S.C. § 2320.  Here, plaintiffs allege that H-Cap is the owner of the mark registered on the principal register in the USPTO. *See*

37

trademark infringement claims into mail or wire fraud in order to state a violation of RICO.

With regard to the second aspect of the alleged scheme — sales of defective counterfeit sealant — plaintiffs' allegations of mail and wire fraud fail for lack of specificity.[145] Plaintiffs allege that the H-Cap defendants "have actually deceived and continue to deceive a substantial number of purchasers of concrete sealant and/or the concrete sealant industry in general."[146] But the only specific misrepresentations plaintiffs point to are statements on Evercrete Delaware's website claiming ownership of the Evercrete brand.[147] The Complaint is devoid of any explanation of "where and when the fraud" on customers occurred.[148] Plaintiffs do not specify any particular customers who reasonably relied on the H-Cap defendants' statements, how the alleged mistatements were

Compl. ¶ 51.

[145]    *See* Compl. ¶ 170.

[146]    *Id.* ¶ 187(a)(ii).

[147]    *See id*. ¶¶ 73-75 (quoting Evercrete Delaware's website as stating that its products "'Stand the Test of Time,'" its "'brand name is over 60 years old,'" and H-Cap holds trademark rights "'to Evercrete'").

[148]    *In re Sumitomo Copper Litig.*, 995 F. Supp. at 456 (citation omitted) (where a plaintiff claims that specific statements "themselves contained false or misleading information, the complaint should specify the fraud involved, identify the parties responsible for the fraud, and where and when the fraud occurred").

material, or the nature of the injury suffered by customers.[149] These allegations do not meet the requirements of Rule 9(b).[150]

Thus, plaintiffs have only alleged one predicate act of wire fraud — that the H-Cap defendants used the wries to obtain a fraudulent assignment from Hardy. This lone allegation is insufficient to plead a pattern of racketeering.

### b. Continuity

Assuming *arguendo* that plaintiffs had pleaded at least two predicate acts of fraud, I harbor doubts as to whether plaintiffs' allegations would establish a pattern of racketeering activity. The alleged scheme is aimed primarily at one victim, Willis, is perpetrated by a small number of individuals, and is at its core a commercial dispute over rights to Evercrete.[151] Plaintiffs point to only one case in

---

[149]   *See Synapsis, LLC v. Evergreen Data Systems, Inc.*, No. C 05-01524, 2005 WL 1656901, at *3 (N.D. Cal. July 13, 2005) (mail fraud claim based on internet sales of trademarked technology failed to meet requirements of Rule 9(b) where plaintiff did not plead "when and where the fraudulent sales occurred" or "to whom the sales were made").

[150]   *See Allied Irish Banks, P.L.C. v. Bank of Am., N.A.*, No. 03 Civ. 3748, 2006 WL 278138, at *8 (S.D.N.Y. Feb. 2, 2006) ("As an essential element of a cause of action for fraud . . . [justifiable] reliance must be pleaded with particularity pursuant to [Federal Rule of Civil Procedure] 9(b)") (alterations in original and citations and question marks omitted).

[151]   Despite plaintiffs' references to multiple victims, I interpret the Complaint as alleging that a small number of parties engaged in activities with a narrow purpose directed primarily at Willis. *See Lefkowitz*, 2003 WL 22480049, at *9.

which a court has upheld a civil-RICO claim based on mail and wire fraud connected with trademark or copyright violations, and in that case, plaintiffs alleged a more extensive scheme with varied participants and multiple victims.[152] Here, the alleged predicate acts of mail and wire fraud have a single purpose: infringement of the Evercrete brand.[153] Plaintiffs do not allege that the H-Cap defendants pose any future criminal threat other than repetition of the same misrepresentations and continued assertion of their rights to that brand.[154] It is

[152]    *See Galerie Furstenberg v. Coffaro*, 697 F. Supp. 1282, 1285 (S.D.N.Y. 1988) (plaintiff copyright holders alleged that six individual defendants had conspired to create multiple counterfeit versions of eight drawings by the artist Salvador Dali, generating over $32.5 million in illicit profit from unsuspecting art investors). The court did not analyze whether plaintiffs had alleged continuity.

[153]    *See Chivalry Film Prod. v. NBC Universal, Inc.*, No. 05 Civ. 5627, 2006 WL 89944, at *3 (S.D.N.Y. Jan. 11, 2006) (dismissing claim for lack of continuity where "plaintiff alleges nothing more than a single, limited scheme to exploit his copyrighted work . . . [a] scheme of such limited purpose, accomplished in such a limited period, cannot constitute a RICO pattern"); *Singh v. Parnes*, 199 F. Supp. 2d 152, 161 (S.D.N.Y. 2002) (dismissing RICO allegations where "the defendants' conduct in connection with the events and transactions pertain[ed] to a single property").

[154]    *See First Capital Asset Mgmt., Inc.*, 385 F.3d at 173 (finding no continuity despite racketeering acts spanning more than two years, where "[a]t bottom, Plaintiffs have alleged that [defendant] engaged in a single scheme to defraud two creditors by quickly moving his assets to his relatives and then concealing the existence of those assets during his bankruptcy proceeding" and "every factor other than duration cuts against a finding of closed-ended continuity"); *Jerome M. Sobel & Co. v. Fleck*, No. 03 Civ.1041, 2003 WL 22839799, at * 12 (S.D.N.Y. Dec. 1, 2003), *adopted by* 2004 WL 48877 (S.D.N.Y.

unlikely that this could amount to a pattern of racketeering within the meaning of RICO.[155]

## V. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted in part and denied in part. Defendants' request that Evercrete New York be realigned as a defendant is denied. In view of the fact that plaintiffs have already amended their Complaint twice and have not requested leave to amend again, I am assuming that any further pleading as to the dismissed claims would be futile. The Clerk of the Court is directed to close the motion (Docket Nos. 4 and 5). A status conference is scheduled for May 9, 2006 at 2:30 p.m.

---

Jan. 8, 2004) (Gorenstein, M.J.) ("[T]he lack of variety among the predicate acts, the presence of only one scheme with a narrow goal, the small number of participants and the presence of only one victim . . . far outweigh the duration of the fraudulent conduct.").

[155]    *See Medinol Ltd.*, 346 F. Supp. 2d at 616 (even if enterprise "was a fraudulent scheme whose participants used the mails and telephone wires in accomplishing their ends, it is not the 'pattern of racketeering activity' intended by § 1962(c)").

41

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:    New York, New York
          April 27, 2006

42

## - Appearances -

**For Plaintiffs**:

Serhiy Hoshovsky, Esq.
GVOZD & HOSHOVSKY
33 W. 19th St. Ste. 307
New York, New York 10011
(646) 619-1123

Maria A. Savio, Esq.
Frank D. Decolvenaere, Esq.
GOTTLIEB, RACKMAN & REISMAN, P.C.
270 Madison Avenue, 8th Floor
New York, New York 10016
(212) 684-3900

**For Defendants:**

Toby Soli, Esq.
Michael P. Socarras, Esq.
Robert L. Elam, Esq.
GREENBERG TRAURIG LLP
200 Park Avenue
New York, New York 10166
(212) 801-9200